(50 App. Div. 590.)

## BERRY v. ATLANTIC STORAGE CO.

(Supreme Court, Appellate Division, Second Department.   April 14, 1900.)

MASTER AND SERVANT—NEGLIGENCE—PLACE TO WORK—REASONABLE SAFETY.
Plaintiff was taken by defendant's foreman from outside the grain elevator, where he was accustomed to work, to a place within, comparatively dark, and, being instructed to step on a raised platform, walk to a bin, and ascertain if it was open, started to do so, when the platform collapsed, and one of his legs was crushed in a hopper beneath. The platform was constructed nearly nine years previously, and, until a few weeks before, its sole use was to enable workmen, on removing the cover, to watch the movement of grain through the conductor.   Since then, temporary bins were constructed on that floor, and, to open them, it was necessary to step on the hopper boxes.   No inspection was ever made of the condition of the box, and the only evidence in that regard was that the foreman had stood thereon two minutes before the accident. Held, that defendant was guilty of negligence.

Appeal from trial term, Kings county.

Action by Michael Berry against the Atlantic Storage Company. From a judgment in favor of plaintiff, defendant appeals.   Affirmed.

Argued before BARTLETT, HATCH, WOODWARD, and HIRSCHBERG, JJ.

Frederick Hulse, for appellant.
Joseph Center Wight, for respondent.

HIRSCHBERG, J.   The plaintiff was in defendant's employ on November 29, 1897, at a building known as the "Watson Elevator,"

in Brooklyn, in which the defendant then carried on the grain business. Entrenched under the floor was a grain conveyor, running through the building from street to river,—a distance of over 100 feet. This conveyor was of iron,—a spiral drum or endless screw; and, when in operation, it carried the grain, loaded from bins above, down into the trench or box in which the conveyor was, along its length, and to the dock. At intervals above the box containing the conveyor were hopper boxes, standing 2 feet high above the floor, and 3 feet long by 20 inches wide. They were covered with wooden covers made of 1⅓-inch stuff, and adjusted to the top of the hoppers by cleats 2½ inches wide and about 1½ thick, so that, with these cleats screwed on the cover, the latter would not slip when placed on the top of the hopper box. From either side of the hopper a diagonal chute was constructed, leading to a perpendicular chute which ascended to the grain bins. The whole was constructed at the time the elevator was built,—some eight or nine years before the accident. During that period, excepting six or eight weeks immediately before the accident, there were no bins on the floor in question,—the grain coming down from bins on a floor above by means of the perpendicular chute connecting them with the diagonal chute, and so through the hopper to the conveyor; and the only use for the movable cover of the hopper then was to enable the workmen, when necessary, to look into the conveyor and see that the grain was moving properly, and to aid it in case of a jam. But a few weeks before the accident temporary bins were built on the floor where the accident occurred, and these temporary bins were connected with the chutes; and, in order to feed grain from these bins to the conveyor, it became necessary at times for the men to climb into them, in order to open the connection and start the flow. The height was about 6 feet, and the only way to reach the opening in the bin was by stepping on the hopper cover. It may be further noted that the place is not very light, even in daytime, and that the work appears to have been carried on with the aid of lanterns.

On the day of the accident the plaintiff, who does not appear to have done such work before, was taken by the foreman from customary work he was doing, outside the building, to the first elevator floor. The foreman said to him, according to the plaintiff's story: "Berry, you step up on this box, and go into the bin and give me the number of the chute. I am going to send grain out." The foreman testified: "He went up there because I called him, and I says, 'Berry, jump up there and see if No. 7 is open.' That is frequently done in this place. Those boxes are used to step up on. Q. Were those boxes used to look into the bins from? A. That is what is their purpose, and they are used continually." It is not clear that he means the bins, in this statement, but that the boxes were used for stepping on to look into the temporary bins after the construction of the latter is undoubted. The plaintiff stepped on the cover with his left foot, and was in the act of raising his right foot to the bin, when something slipped or broke, and his left leg went down into the conveyor, and was so badly crushed that amputation at

the middle of the thigh became necessary. The plaintiff said that when he stepped on the box the cover slid one side, and his leg went into the box, and that the sides of the box fell right out. The foreman said: That the plaintiff was on the box, but had not yet planted his right foot. "He come up with his left foot, and was planting his right foot when the accident occurred. I didn't see his foot go in the box." "He stepped up with his left foot, and reached out with his right foot, when the cover slipped, and Berry went down, perpendicular. The cover slipped which was on this box or hopper, as we have been defining it. It slanted. I couldn't tell what made it slip." The foreman further testified that at the time of the accident the cover went part way down in the hopper, and the cleat lay on the floor, not broken, but torn off. After the accident, he said, "the cover had had the cleats put back, and put on, so that we could work. I mean by the 'cleats,' the side of the cover had had the cleats on it broke off." The defendant gave no evidence. There was no proof of any examination or inspection of the condition of the hopper cover at any time, excepting that the foreman testified that he was on it not two minutes before the plaintiff stepped there, and that it was then in place. But that the cleats were sound and fast, and able to resist such pressure as might be incident to the act of climbing on and from the cover, or that any examination had ever been made of them since their construction, the case is wholly bare of testimony. It follows, on the undisputed proof as presented to the jury, that the plaintiff was furnished with a place necessary for him to occupy in order to do his work, which had been adopted by the master for that purpose, although not originally designed for it, and which was so adopted without apparent examination or inspection with a view of ascertaining its fitness, and which, upon use, proved to be unsafe and dangerous. It requires no array of authorities to demonstrate that, under the circumstances stated, the defendant became liable for the accident, because of failure to furnish the plaintiff with a reasonably safe place to work in. The most recent judicial expression on the subject is to be found in Cunningham v. Paving Co. (Sup.) 63 N. Y. Supp. 357, where one of two loose, movable planks, upon which a workman was obliged to stand during a certain part of his work, broke under him, and he was precipitated into a bin beneath. Mr. Justice Barrett, writing for the court, said:

"Although these planks were loose and movable, yet they constituted a platform upon which a part of the company's work was regularly done. In that sense, the structure was permanent in its nature. It was not an ordinary 'appliance,' relating to an isolated job or a transient undertaking. It was essentially a 'place' where the defendant's business was permanently conducted, and where its employés were steadily required to work. * * * Upon these facts, we think the case was plainly for the jury. The defendant was bound to furnish the plaintiff with a reasonably safe place to work in. That was its duty, and it could not exempt itself from liability for nonperformance by delegating performance to another. Benzing v. Steinway, 101 N. Y. 547, 5 N. E. 449. It was a breach of that duty to permit the platform upon which the plaintiff was here required to work to wear out and become rotten. It is well settled that the unexplained giving way of a permanent structure upon which employés are required to work is prima facie evidence of the master's negligence. Solarz v. Railway Co., 8 Misc. Rep. 656, 29 N. Y. Supp. 1123, affirmed in general term in 11 Misc. Rep. 715, 32 N. Y. Supp.

1149; affirmed in court of appeals in 155 N. Y. 645, 49 N. E. 1104; Green v. Banta, 48 N. Y. Super. Ct. 156, affirmed in 97 N. Y. 627."

The case was submitted to the jury in a very careful and excellent charge, which would have permitted them to have found in favor of the defendant on the theory that the cleat came off, not from any weakness in its fastening, but because of some improper use of the structure by the plaintiff, in pressing his foot too strongly against it while leaning over towards the bin, and thus causing the cover to slide off, and so to break the cleat from it after the lid slid off, and in spite of a secure fastening. This was certainly favorable to the defendant. The foreman testified in reference to the manner in which the plaintiff mounted the box, "I saw him step on that box, and land square." There was no evidence tending to indicate that the casualty resulted from any improper manner of using the box, but all the evidence was to the effect that the accident was occasioned solely because the box proved inadequate to sustain the pressure to which it was subjected in ordinary and careful use. The learned trial justice also submitted to the jury the question whether it was not the defendant's duty, by inspection from time to time, to see whether the cover remained safe, and whether it was not liable to slide off. This was as favorable a view of the legal measure of care as the defendant was entitled to. The cover was never intended to bear weight when it was originally furnished. For years its sole office was to cover the hopper, being occasionally lifted off in order that the interior of the box might be examined. When, shortly before the accident, its use was changed to that of a platform on which the men were required to mount in connection with their work in and about the temporary bins, it may well be doubted whether, in view of its movable nature, and the danger lurking beneath it, it was not the defendant's duty to carefully examine it, and see whether it could be safely used in the new manner. In a sense, it may be said to have been then newly supplied for use; but, so far as the evidence shows, nothing was done for the purpose of ascertaining whether or not it was safe to use as suggested, excepting the fact that it was used in the new manner, and no accident appears to have occurred until the one in question.

The court was requested by the defendant to charge that "the mere fact of the happening of the accident is not sufficient to establish the negligence on the part of the defendant." The court said, "That I leave to the jury." The defendant excepted, whereupon the court added, "On the question of how it happened,—whether this thing came off before the lid slid off." Having left it to the jury to say whether the cleat came off first, and thus caused the accident, or the cover slid off, from improper use, and the cleat then afterwards broke off, the charge was, in effect, that, if the jury reached the first conclusion, they might find negligence, based on the manner of the "happening of the accident." In this there was no error. The case is within the principle of the Solarz and Banta Cases, cited in the Cunningham Case, supra, and fully warrants the ruling.

The judgment and order are to be affirmed, with costs. All concur.